## STATE *v.* DANIEL BROWN.

To describe the offence of forging a bank bill, under the 68th section of the "Act concerning crimes and punishments," contained in the Digest of 1844, or the offences of uttering, or of having in possession, such a bill, with intent to utter it, knowing it to be counterfeit and with intent to defraud, the indictment should allege with due certainty, that the bill was in imitation of, or purported to be, a bank bill issued by some *corporation* established as a bank; and, to maintain the indictment, some proof of the establishment of the corporation, as a bank, must be given, to satisfy this necessary allegation.

An indictment for possessing a forged bank bill or for uttering it, knowing it to be forged, *with intent to defraud,* is not maintainable at common law, as descriptive of a common law cheat, inasmuch as to constitute such an offence, somebody must be, and therefore must be described in the indictment to have been, actually cheated.

Such an indictment is, however, maintainable under the 72d section of the "Act concerning crimes and punishments," contained in the Digest of 1844, without alleging that the bank bill criminally possessed or uttered was in imitation of, or purported to be issued by some *corporation* established as a bank; a bank note or bill being "a promissory note," or at least, "a writing purporting to contain the evidence of a debt, contract, or promise," &c. on the part of the bank, within the purview of that section.

To maintain an indictment under this latter section, if there be no allegation in it of the existence of the bank whose forged bill is charged to be criminally possessed or uttered, there need be no proof of the existence of the bank, either as a corporation or association, so that the bill *purports* to be in imitation of a bill issued by either; unless indeed the fraudulent uttering is charged to have been with intent to defraud the bank, when proper proof of the existence of the bank must be,given.

Where, however, an indictment for criminally uttering a forged bill, charged, that the note criminally uttered by the prisoner "*was in imitation of* " as well as " purported to be a bank note issued by," a particular bank, by name, this allegation, as descriptive of the means by which it was committed, must be supported by some proper proof of the existence of a genuine bill to be imitated; and although the statement of the fact of the existence of the bill, and of the bank issuing it, in some printed publication, or reputation, would not be proper evidence of that fact, yet the uttering of a note as true, *purporting* to be issued_by a particular bank, is an admission or statement of the existence of a genuine bill, and of the bank issuing it, by the utterer, sufficient, in the absence of proof to the contrary, to prove their existence.

Persons who cannot swear with any certainty that they ever saw a genuine bill of the bank whose bills are charged to have been imitated, are not competent at common law, from having seen descriptions or *fac similes* of the genuine or forged bills in Bank Reporters or Bank Directories, to swear whether the bills charged to be forgeries, or imitations merely, are such; and the 77th section of the " Act concerning crimes and punishments," in the Digest of 1844, does not make them so.

Evidence that the prisoner on the same day, and at the same gambling sitting, passed as genuine, *spurious,* as distinguished from *counterfeit* bank bills, and that when arrested, he had several such bills, both signed and unsigned, in his possession, is admissible, for the purpose of showing that he *knowingly* passed the *counterfeit* bill, with the criminal uttering of which he is charged.

THE prisoner was tried at the May term of the court of common pleas for the county of Newport, 1857, for having in

his possession, with intent to pass, and for passing, with intent to defraud one Cornelius Keating, a ten dollar counterfeit bill of the Bank of Montgomery County, Pennsylvania. The indictment contained two counts. The first count charged that the prisoner, at a time and place certain, " did have in his possession and custody, a certain false, forged, counterfeited, and altered bank bill, purporting to be and in imitation of a bank note of the Bank of Montgomery County, of Morristown, in the state of Pennsylvania, which said false, forged, and counterfeited bank note was in words and figures as follows, that is to say :—

" 10.        3108.        10.        Ten.        10."

" The Bank of Montgomery County promise to pay ten dollars on demand, to R. Magune or bearer.

*Morristown, Penn., June* 6, 1855.

W. H. Slinglief, Cashier.        J. Boyer, President.

" 10.        10."

with intent to utter, pass, and tender the same in payment as true, he, the said Daniel Brown then and there well knowing the said false, &c. note to be false, &c. against the form of the statute, &c."

The second count charged that the prisoner, at the same time and place, " did utter, publish, pass, and tender in payment as true, to one Cornelius Keating, a certain false, forged, and counterfeited bank note, in imitation of and purporting to be a bank note issued by the Bank of Montgomery County, in the state of Pennsylvania, which said last-mentioned note was in words and figures as follows, (as in the first count,) he, the said Daniel Brown, then and there well knowing the same to be false, forged, and counterfeited, with intent to defraud him the said Cornelius Keating, against the form of the statute, &c."

At the trial before Mr. Justice Sherman, the passing, by the prisoner, of the note described in the indictment, to Keating, was proved ; and for the purpose of proving that the bill was counterfeit, the government called one George T. Weaver, who swore, that having been a cashier of a bank for thirty years, and accustomed to handle money, he believed that there was such a bank as the Montgomery County Bank, and that the ten dollar

bill in question was counterfeit; that he had no recollection of ever having seen any bills of the bank which appeared to be genuine, and that all that he knew of the existence of the bank was from the Bank Note Directory, or publications of that character. The testimony of this witness was objected to by the counsel for the prisoner, on the ground, that a sufficient foundation of knowledge on the part of the witness had not been laid; but notwithstanding the objection, the judge ruled that the testimony was admissible, and the same passed to the jury. Subject to the same objection, the judge also admitted the testimony of one Benjamin Mumford, who swore also, that he had been cashier of a bank for many years, and used to handling money, and familiar with bank notes; that he thought that there was a bank of the name of that set out in the indictment, and that he must have seen a bill of such a bank; for in some way, the name seemed familiar to him. He had seen its name in publications, but had no other knowledge of its existence; and thought, that the ten dollar bill shown to him was counterfeit. He had compared it with some *fac simile* of a bill of that bank, contained in a bank publication, and thought, that the writing in the bill seemed stiffer than in the *fac simile ;* that he had no knowledge of the existence of the bank but from the bank publications, and from the fact, that its name seemed so familiar to him; that he thought he must have seen some bill of the bank.

In order to prove that the prisoner uttered the note in question, knowing the same to be counterfeit, the court admitted, notwithstanding the objection of the counsel for the prisoner, evidence that the defendant at the same time, that is, during the same gambling session, passed to Keating by way of exchange for a five dollar bill, two spurious unsigned bank bills, one, for a three dollar bank bill, and the other, for a two dollar bank bill; and that upon the arrest of the prisoner, there were found upon his person other spurious, as distinguished from counterfeit bank bills, both signed and unsigned, which were laid before the jury.

Upon the coming in of this evidence, the counsel for the prisoner contended, in substance, that the government must

prove that there was such a bank as that whose note it averred had been counterfeited; that to that fact the testimony of Mumford and Weaver, founded as it was upon the contents of printed publications, not produced, was wholly incompetent, and that no sufficient evidence had been produced by the government, to show, that the paper alleged to be forged bore such resemblance to the genuine paper of the Montgomery County Bank, as was calculated to deceive persons of ordinary observation, or that it bore any resemblance to such paper; and requested the court so to charge the jury. This, the court refused to do; but instead, charged the jury, " that it should be shown by the state that there was in existence such a bank as ' The Montgomery County Bank;'" but that this might be proved by reputation, by showing that it was set down as an existing bank in such publications as were in use, and as were resorted to by bankers and men of business, and that it was competent for the state to prove that such a bank was set down in these publications by witnesses upon the stand; and, if the defendant had desired that such publications should have been put in at the trial, he should have given the attorney-general notice at the trial. The court also charged the jury, that the bank bill, alleged to be counterfeit, ought to bear such a resemblance to the original as would deceive a man of ordinary intelligence; and left to them, upon the evidence submitted, the question, whether the prisoner knew, when he uttered it, that it was forged and counterfeit.

To these rulings, and to the above charge, exceptions were duly taken by the counsel for the prisoner; and a verdict of guilty having been returned, the same were allowed by the judge, and came on to be argued before this court, at its August term, at Newport, 1857.

*Sheffield,* for the prisoner, contended, that the evidence as reported showed, that there was no competent evidence before the jury of the existence of the Montgomery County Bank, or that the bill, charged to have been uttered by the prisoner, was forged, or that it bore any resemblance to, and much less, as was averred, in imitation of the genuine bills of that bank. The witnesses had, as both in substance avowed, no other knowledge

of the bank, or of its bills, than what they had derived from publications, called Bank Directories or Reporters; and as these, according to a well-settled rule, could not be admitted to prove any fact stated in them, so neither could knowledge of a fact, solely derived from them, be sufficient to qualify a witness to swear to it. He submitted that the 77th section of the act concerning crimes and punishments, (Dig. 1844, p. 392,) had not, in these respects, introduced any new rule of evidence.

The passing and possession of *spurious* bank bills was clearly incompetent evidence to prove that the prisoner knowingly passed a *counterfeit* bill. They proved different offences from those set out in the indictment. The farthest to which this sort of testimony has gone, has been, to prove other instances of the same offence, to wit, the having or passing of counterfeit bills. 3 Greenlf. Ev. §§ 105, 111.

*Hart, Attorney-General,* agreed, that if the indictment had charged an intent to defraud the Montgomery County Bank, it would have been incumbent on the state to have proved its existence; but that, as in this case, the intent charged was solely to defraud Keating, no such proof was necessary. He cited 2 Suppl. U. S. Dig. p. 22, paragraphs 39, 45, 46; *Commonwealth* v. *Riley,* Thatcher's Crim. Cases, 67; *People* v. *Davis,* 21 Wend. R. 309; *People* v. *Peabody,* 25 Wend. R. 472.

As experts are under oath, we have nothing to do with the sources of their knowledge, which is in most cases derived from books.

Upon principle, he submitted, that to the question of the prisoner's *scienter,* evidence of his having passed, about the same time, and having, when arrested, in his possession, the *spurious* bills, signed and unsigned, laid before the jury, was competent and pertinent testimony. 3 Greenl. Ev. § 111, n. 2; *Rex* v. *Hough,* Russell & Ryan, 120.

AMES, C. J. This indictment seems to have been treated below and in the argument before us, as if found, and to be maintained, under the 69th and 70th sections of the act concerning crimes and punishments (Dig. 1844, 390). Those sections, which are to be read with 68th section of the same act in order to be understood, relate, so far as bank bills or bank notes are

concerned, to the uttering of counterfeit bank bills, knowing them to be counterfeit, and with intent to defraud, and the having such bills in possession with such knowledge and intent, only when in imitation of or purporting to be bank bills issued by some " corporation, which is, or hereafter may be, established as a bank, in this state, or elsewhere." Such is the precise language of the 68th section, which relates to the *forging* of bank bills ; and the 69th and 70th sections, relating to the criminal *uttering* and *having in possession* of bank bills, import the same limitation, by the words, " any *such* false," &c. " bank bill or note," found in both of them. To describe, therefore, an offence against either of these sections, the indictment should allege with due certainty, that the forged note criminally uttered or possessed, was in imitation of, or purported to be a bank bill issued by some *corporation* established as a bank ; and in such case, some proof of the establishment of the corporation as a bank, (what, it is not necessary now to decide,) must be given to satisfy this necessary allegation.

The indictment before us, however, contains no such allegation, and could not therefore be maintained under either of those sections. In this respect, it will be noticed, that these sections of our statute differ materially from the statute of New York, to the exposition of the words of which, the cases of *People* v. *Davis*, 21 Wend. R. 310, 312, 313, and *People* v. *Peabody*, 25 Wend. R. 472, have been cited on the part of the state. The words of that act are, or were, " issued or purporting to have been issued by any *corporation* or *company* duly authorized by the laws of the United States, or of this state, or of any other state, government, or country,"—words which include the forgery, &c. of the bills of all banks, whether incorporated or not.

Nor is this indictment maintainable at common law. The offence of actually obtaining money or other valuable thing by the use of a false token, is undoubtedly punishable at common law, as a cheat; but to constitute such a misdemeanor at common law, somebody must have been defrauded or cheated ; whereas this indictment merely charges, in one count, the possessing, and in the other, the uttering of the forged bank bill

45 *

with an *intent* to defraud. 2 East's P. C. 825, 826. The indictment is, however, maintainable, in our view, under the 72d section of the act concerning crimes and punishments, (Dig. 1844, pp. 390, 391,) which enumerates amongst the many instruments, the forgery, or criminal uttering of which when forged, is to be duly punished, any " promissory note," and finally, " any writing whatever purporting to contain the evidence of any debt, contract, promise, &c." A bank note, such as this indictment describes and sets forth, is " a promissory note," and at least purports to contain the evidence of a debt, contract, or promise on the part of the bank ; and fairly comes within the purview of this section, whether the bank be incorporated or not. *Brown* v. *Commonwealth*, 8 Mass. 64 ; *Commonwealth* v. *Carey*, 2 Pick. R. 47, 49, 50 ; *Commonwealth* v. *Riley*, Thatcher's Crim. Cas. 67.

We have called attention to the section under which we deem this indictment sustainable, that we may occupy a proper position from which to discern, whether any evidence of the existence of the Montgomery County Bank was necessary to be given to the jury, in order to convict the prisoner under it ; the absence of competent evidence to prove its existence being the first exception, in proper order, to the rulings and charge of the court below. Now this section punishes, not only the forgery and uttering with a criminal intent of the forged instrument in imitation of something actually existing, or made by some person or corporation actually existing, but, as we have seen, the false making, or uttering with the criminal knowledge and intent, of " any writing whatever *purporting* to contain evidence of any debt, contract, promise, &c. ; "—that is, as we construe it, of any writing professing on its face to contain such evidence. In this view, had the indictment simply charged, as it might have done, that the prisoner uttered a forged note with the criminal knowledge and intent, purporting to be the promissory note of the Montgomery County Bank, or a writing containing evidence of a promise by the Montgomery County Bank, we mean of course with due certainty, no evidence of the existence of the bank, either as a corporation or association would have been necessary, since the crime described by this

section of the statute would have been set forth in the indictment, and might be fully proved, whether such a bank existed or not. *People* v. *Davis*, 21 Wend. R. 310, 312, 313, and cases cited. If indeed the allegation was, that the fraudulent uttering was with intent to defraud the bank, proper proof of the existence of the bank would be requisite. *People* v. *Peabody*, 25 Wend. R. 472.

The indictment before us, however, does not so describe the offence committed by the prisoner ; but alleges that the note criminally uttered by him "was *in imitation of*, and purported to be, a bank note issued," &c. As descriptive of the particular offence charged, and of the instrument and means by which it was committed, we deem this allegation so far material that some proper proof should have been submitted to the jury to support it. An imitation supposes something to be imitated ; an imitated bank bill supposes a genuine bank bill, issued, of course, by some existing bank. Although we do not think that in a case in which it was necessary to prove the existence of a bank, reputation, and, therefore, the statement of the fact in a printed publication would be sufficient, yet we do think, that the uttering as true, a note purporting to be issued by a bank, is an admission or statement of the existence of the bank, by the utterer, of the strongest character ; and certainly, in the absence of all proof to the contrary, as in this case, quite sufficient to prove its existence. *United States* v. *Foye*, 1 Curtis, C. C. R. 365, 366. With proof of this sort in the case, if the mere question had been whether the Montgomery County Bank existed or not, we should not have been disposed to grant a new trial because the judge below charged the jury that reputation alone was sufficient evidence of the existence of the bank, however mistaken we might have deemed him to be.

The allegation, however, that the uttered bill was in imitation of, as well as purported to be issued by, the Montgomery County Bank, we have already said we deem to be material. Indeed, in such a case, not only do the cases and text-books suppose some proof of imitation necessary, but define the degree of resemblance necessary to be proved, nearly in the words of the learned judge who tried this case below, as such, as would

impose upon persons of ordinary observation. 2 Starkie, Ev. 579; 2 East, P. C. 951, 952; *State* v. *Carr,* 5 N. H. 367. The exception, therefore, taken to the evidence offered in support of this allegation, involving also, as it seems to us to do, an exception to, or, at least, bringing before us the kind of evidence by which the forgery itself was proved, next demands our attention.

Without going into a critical analysis either of the rulings upon the testimony or of the charge, it sufficiently appears from the bill of exceptions before us, that the fact, that the bill uttered was an imitation of the genuine bills of this bank, as alleged, or even that it was a forged bill of this bank, rested wholly upon the testimony of two witnesses; one of whom swore, that he had never seen a genuine bill of the bank and knew nothing about the bank or its existence, except what he had derived from some printed bank reporter or directory, and the other of whom, could not swear, with certainty, to any other source of knowledge, and seems to have come to a conclusion that the bill was forged, from a comparison between the handwriting in the bill uttered and a *fac simile* of the handwriting in a *fac simile* of a bill of this bank, found by him in some similar publication.* It is hardly necessary to say, that printed books or publications of any sort are not received in courts of justice as evidence of any fact stated in them, however practically useful they may be as guides to professional or business men. It is indeed true, as suggested, that much of the scientific knowledge of experts in medicine, surgery, mechanics, chemistry, &c., is derived from books; and the knowledge of experts in any of the arts founded upon science, would, in general, be small indeed, had they not availed themselves of the fruits of the research and experience of their predecessors as taught in books. Yet, even in such a case, the scientific book would be no evidence of any fact stated in it interesting to an issue on trial in a court of law; nor an historic work, of the happening of any event related in it, to be found by a jury; though valuable, and admissible, for the purpose of showing, when necessary to be shown, the state of invention, the course of composition, the meaning of words, or the theories or opinions which prevailed in the age

in which they were written. See *Darby* v. *Ouseley*, 36 Eng. Law & Eq. R. 519, 524, 525, 526, 529, 531, in which this matter was recently considered by the court of exchequer. Much less can ephemeral publications, such as bank directories or reporters be referred to, or produced in court, in proof of any fact stated in them; or the *fac similes* of bank bills, printed in them, be employed as standards of comparison, to which bills charged as counterfeit are to be referred, for the purpose of proving either their general resemblance to, or special difference from, the genuine bills of the bank. Nor, however expert he may be as a detector of bad money in general, do we deem any witness qualified to instruct a jury whether a particular note counterfeits another or others of the same bank, who has never seen a genuine note of that bank, but whose whole knowledge of its notes is derived from engraved *fac similes*, or printed descriptions, for the accuracy, or even honesty of which, we have no voucher. It is within every man's experience, that many genuine bills of distant banks have been condemned as counterfeits, by experts, on account of bad engraving or even bad paper; they having no knowledge of the engraving or paper actually employed. As to the handwriting in the body of the bill, or of the signatures of the president and cashier, the rule is well settled, that no one is competent to swear to its being either genuine, or forged, who is not acquainted with his handwriting from seeing the writer write; or, from frequently seeing genuine specimens of it in the usual course of business; or, which is an American extension of the sources of such knowledge by no means universal, from a comparison before the jury of the questionable handwriting, with specimens of it, produced, admitted, or at least, fully and clearly proved to be not only genuine, but not got up for the occasion. It is evident that he who is acquainted with the genuine handwriting only from printed descriptions and *fac similes*, is qualified to swear with regard to it in none of these accustomed modes. Nor do we deem that the 77th section of the act concerning crimes and punishments, (Dig. 1844, p. 392,) was designed to introduce so loose a practice, in so grave a matter as a criminal charge of this degree, as to allow persons to swear to the handwriting on, or to the gen-

uineness or falsity of bank bills, who could not certainly say that they had any other knowledge of either, than what they had derived from a bank reporter. The latter clause of that section to which we have been referred, is, " but the testimony of any *competent* witness who is acquainted with the hand-writing of the person, or who has knowledge of the difference of true and counterfeit or altered bank bills, and who is skilled therein, shall be received as competent evidence to prove any such bank bill or note to be false, forged, counterfeited, or altered." After dispensing, in certain cases, with a supposed necessity, unknown to the common law, of calling the party whose name is forged to prove the fact, the section proceeds, in the words just quoted, to specify the kind of proof to the forgery which may be substituted. By the express words of the section, however, the witness must be " competent," and, so far as knowledge of the difference between true and counterfeit bills is concerned, must be " skilled therein ;" leaving the standard of both competency and skill to be fixed by the courts, under the general law.

In conclusion upon this point, we do not think the witnesses to resemblance or forgery called by the government, well skilled or competent, according to any rule of law known to us, to swear to the matter to which their testimony was received ; nor do we think it safe that a conviction should rest upon testimony so loose and uncertain ; and, upon this ground, there must be a new trial, as requested by the prisoner.

This disposes of the motion ; but as our attention has been called, at the argument, to another ground upon which it was made, we may as well dispose of it for the purposes of the new trial. We refer to the admission, by the judge, of proof, that the prisoner, on the same day, and at the same gambling sitting, passed as genuine, *spurious*, as distinguished from *counterfeit*, bank bills, and that, when arrested, he had several such bills, both signed and unsigned, in his possession, for the purpose of showing, that he *knowingly* passed the counterfeit bill, with the uttering of which he was charged.

It is very true, that no case, that we have seen, has gone to the precise point of the admissibility of such testimony, for the

above purpose. The passing and possession of other counterfeit bills of the same denomination, or of other denominations, and purporting to be bills of the same or other banks, have been familiarly proved, for the purpose of showing the *scienter* of the prisoner in passing the particular counterfeit bill charged. The notion upon which the admissibility of such testimony is based, according to an eminent writer on the criminal law of Scotland, is, the tendency of such evidence to prove that the prisoner is a dealer in such paper, caught in the very act of disposing of it, instead of a casual receiver and innocent passer of the particular bill traced back to him. Allison on the Principles of the Crim. Law of Scotland, 420. In this view, it does not seem to us to affect the bearing of the evidence upon the question of *scienter*, whether the bills be spurious or counterfeit. The two crimes may be technically different; but they are of precisely the same kind, in this, that they indicate the prisoner to be a dealer in bad bank paper, and so indicate that he did not innocently pass the counterfeit bill, with the uttering of which he is charged. Within the principle we think, therefore, that the evidence was admissible, and see no ground for this exception.

New trial granted, to be had at the next term of the court of common pleas in the county of Newport.